UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCOTT RODRIGUEZ, ET AL.,          :
           Plaintiffs,          :          CIVIL ACTION NO.
     v.          :          07-cv-1816 (JCH)
                            :
BEAR STEARNS          :
COMPANIES, INC., ET AL.          :          APRIL 14, 2009
           Defendants.          :

**RULING RE: DEFENDANT'S MOTION TO DISMISS (DOC. NO. 105),
MOTION TO STRIKE (DOC. NO. 107), AND
MOTION TO TAKE JUDICIAL NOTICE (DOC. NO. 109) AND
PLAINTIFF'S MOTIONS TO COMPEL (DOC. NOS. 110 & 122)**

I.      **INTRODUCTION**

On December 10, 2007, plaintiffs, Scott Rodriguez, Nisha and DeJoy Modica

("the Modicas"), and Tammy Smith (collectively "the plaintiffs"), initiated this action

against defendants, Bear Stearns Companies, Inc. ("Bear Stearns") and EMC Mortgage

Corporation ("EMC") (collectively "the defendants").  On February 5, 2008, defendants

filed a Motion to Dismiss (Doc. No. 28) plaintiffs' Complaint for failure to state a claim.

In response to defendants' Motion, on March 31, 2008, plaintiffs filed an Amended

Complaint (Doc. No. 39).  Defendants subsequently moved to dismiss (Doc. No. 49) the

Amended Complaint on May 2, 2008.

In a Ruling dated November 4, 2008 (Doc. No. 99), the court granted

defendants' Motion and dismissed the Amended Complaint pursuant to Fed. R. Civ. P.

12(b)(6) because plaintiffs had "failed to plead facts sufficient to 'raise a right to relief

above a speculative level.'"  Ruling (Doc. No. 99) at 8 (quoting Bell Atlantic Corp. v.

Twombly, 127 S. Ct. 1955, 1965 (2007)).  However, the court stated that plaintiffs had

"the right to reopen the case by filing, within 21 days, a [second] amended complaint asserting claims based on the alleged mishandling of their mortgage accounts," and further, that "plaintiffs [had] leave to file claims concerning their discrimination claims if they contain sufficient factual allegations." Ruling (Doc. No. 99) at 8. On November 25, 2008, plaintiffs filed a Second Amended Complaint ("2d Amd. Complaint"), and on January 15, 2009, defendants once again moved to dismiss that Complaint for failure to state a claim upon which relief can be granted. The court now considers this third Motion to Dismiss, as well as several pending motions relating to, or dependent upon the outcome of, the Motion to Dismiss.

For the reasons stated below, the defendants' Motion to Dismiss (Doc. No. 105) is granted in part and denied in part. Further, defendants' Motion to Strike (Doc. No. 107) and Motion to Take Judicial Notice (Doc. No. 109) are likewise granted in part and denied in part. Plaintiffs' Motions to Compel (Doc. Nos. 110 & 122) are referred to Magistrate Judge Holly B. Fitzsimmons for adjudication.

## II.   STANDARD OF REVIEW

In deciding a motion to dismiss, the court accepts the allegations of the complaint as true and construes them in a manner favorable to the pleader. Hoover v. Ronwin, 466 U.S. 558, 587 (1984); Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998). The court must draw all reasonable inferences in the plaintiff's favor. See, e.g., Yung v. Lee, 432 F.3d 132, 146 (2d Cir. 2005).

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss for failure to

2

state a claim pursuant to Rule 12(b)(6) tests only the adequacy of the complaint.

United States v. City of N.Y., 359 F.3d 83, 87 (2d Cir. 2004).  In deciding such a motion,

"[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is

entitled to offer evidence to support the claims." Bernheim v. Litt, 79 F.3d 318, 321 (2d

Cir. 1996) (internal quotations omitted).

Federal Rule of Civil Procedure 8(a) provides that to be sufficient, a complaint

must include "a short and plain statement of the claim showing that the pleader is

entitled to relief."  Fed. R. Civ. P. 8.  In the recent decision of Bell Atlantic Corp. v.

Twombly, 127 S. Ct. 1955 (2007), however, the Supreme Court explained that to be

sufficient, factual allegations in a complaint must "'raise a right to relief above the

speculative level.'"  Boykin v. KeyCorp, 521 F.3d 202, 213-14 (2d Cir. 2008) (quoting

Twombly, 127 S. Ct. at 1965).  According to the Second Circuit, what Twombly requires

is not "a universal standard of heightened fact pleading," but rather "a flexible

'plausibility standard,' which obliges a pleader to amplify a claim with some factual

allegations in those contexts where such amplification is needed to render the claim

plausible."  Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir.2007).

Thus, at a bare minimum, the operative standard requires the "plaintiff [to]

provide the grounds upon which his claim rests through factual allegations sufficient 'to

raise a right to relief above the speculative level.'"  See ATSI Commc'ns., Inc. v. Shaar

Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Twombly, 127 S. Ct. at 1965).

Consequently, a plaintiff has an obligation to provide the grounds of his entitlement to

relief using "more than labels and conclusions."  Twombly, 127 S.Ct. at 1964-5.

3

### III.    BACKGROUND

A.    Overview of Plaintiffs' Case

Plaintiffs are minorities allegedly injured by defendants' discriminatory practices in the writing and servicing of residential mortgage loans.[1]  Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the plaintiffs bring this action to obtain relief for themselves and all other African-American and Hispanic/Latino borrowers who, beginning in January 1, 2001, had, or continue to have, a non-prime residential loan serviced by the defendants ("the class").

At all times relevant to this action, defendant Bear Stearns was a Delaware corporation with its principal place of business in New York, and was a leading issuer of securities backed by near-prime and sub-prime mortgages (together, "non-prime" mortgages).  Defendant EMC was a wholly-owned subsidiary of Bear Stearns headquartered in Lewisville, Texas and was one of the nation's largest mortgage loan servicing companies.

Plaintiffs assert two claims: (1) defendants' predatory mortgage servicing practices disproportionately harmed minority borrowers in violation of the Fair Housing Act, 42 U.S.C. § 3605; and (2) defendants engaged in intentional racial discrimination by targeting minority borrowers for predatory mortgage servicing in violation of the 1866 Civil Rights Act, 42 U.S.C. §§ 1981 and 1982

---

[1] For the purposes of this Ruling, "loan servicing" means "receiving any scheduled monthly payments from a consumer pursuant to the terms of any loan, including amounts for escrow accounts, and making the payments of principal and interest and such other payments as may be required pursuant to the terms of the loan."  2d Amd. Complaint at ¶ 20.  Servicing also includes "the administration of loan accounts, the collection of loan payments, the foreclosure of real property, the use of consumer reports, and the furnishing of information to consumer reporting agencies, . . . the collection or imposition of fees in relation to any of the foregoing."  Id.

Plaintiffs' claims are based on their allegations that defendants "targeted plaintiffs to profit based on race."  2d Amd. Complaint at ¶ 26.  Specifically, plaintiffs allege the following.  Defendants "acquired hundreds of thousands of near-prime and sub-prime mortgage loans predominately made to Hispanics and African-Americans." Id. at ¶ 12.  In order to acquire these loans, Bear Stearns "developed computerized algorithms to evaluate loan portfolios being considered for purchase in the secondary market to identify those having attributes more frequently associated with loans granted to minorities . . . ."  Id. at ¶ 16.  For example, Bear Stearns used computerized algorithms to identify "non-prime and 'scratch and dent' loans with significant prepayment penalties or . . . loans where the borrowers of those loans had particular credit attributes."  Id.  Defendants targeted these non-prime loans for acquisition because of their knowledge that "a higher proportion of minorities are present in the non-prime residential lending market than are present in the population as a whole," and their belief that "African-Americans and Hispanics are less sophisticated financial consumers than Caucasians and . . . would be less likely or able to resist predatory servicing practices than Caucasian borrowers, who constitute a smaller proportion of the non-prime loan pool."  Id. at ¶¶ 17, 18.

Once they had acquired the non-prime loans, defendants engaged in a variety of predatory loan servicing practices.  Id. at ¶ 19.  These predatory servicing practices were "designed to extract as much profit as possible from" non-prime loans, and included, inter alia:

Knowingly understaffing critical business units within EMC such as those

5

> responsible for 'boarding' incoming loans, for processing incoming mail, and for processing borrower calls and complaints; designing and implementing systems to maximize fee revenue at the expense of borrowers; utilizing computerized algorithms to drive collections efforts where those algorithms direct those efforts towards minorities in greater proportion than Caucasians; intentionally misrepresenting EMC's entitlement to or the amounts of fees owed by borrowers; imposing unwarranted fees and costs; pyramiding of late fees; unnecessary force-placing of insurance; failing to properly credit payments; reporting of unwarranted derogatory information regarding borrowers to credit reporting agencies; and failing to properly administer escrow accounts.

Id, at ¶ 21.  Thus, the effect of defendants' actions "was that greater numbers of minority borrowers were subject to [defendants'] predatory servicing practices than similarly-situated Caucasian borrowers."  Id. at ¶ 22.  Further, "[w]hile defendants' practice of purchasing non-prime loans in large volume and then predatorily servicing those loans may appear outwardly race neutral, [the practice] resulted in a significantly adverse or disproportionate impact on minorities . . . ."  Id. at ¶ 27.

In addition to these general class allegations, plaintiffs specifically allege that the named plaintiffs – minorities who held residential mortgages serviced by EMC – suffered from EMC's predatory servicing practices.  These allegations are detailed below.

     B.    Predatory Loan Servicing Allegations Concerning the Named Plaintiffs

          1. Scott Rodriguez

Plaintiff Scott Rodriguez is a Hispanic male who resides in Waterbury, Connecticut with his wife, Heather Rodriguez, in a home they own.  2d Amd. Complaint at ¶ 5, 45.  The Rodriguezes refinanced their residential mortgage loan in 2005 with Town and Country Credit Corporation.  Id. at ¶ 46.  In 2005, EMC purchased the loan from Town and Country Credit Corporation and assumed all responsibility for servicing

the loan.  Id. at ¶ 48.  EMC purchased the Rodriguezes' loan because it had identified the loan as a non-prime or "scratch and dent" loan.  Id.  EMC's obligation to service the loan included paying the Rodriguezes' property taxes to the City of Waterbury out of an escrow account kept for that purpose.  Id. at ¶¶ 50-51.  Despite this obligation, EMC failed to pay the property taxes for the second half of 2005.  Id. at 51.  Despite repeated calls and faxes from the Rodriguezes, EMC never corrected this error, leading to a tax lien from the City of Waterbury being placed on the Rodriguez residence in March 2006.  Id. at ¶¶ 52-53.

Furthermore, because EMC never corrected the Rodriguezes' escrow account to reflect the true tax payment schedule, the Rodriguezes' monthly mortgage payment increased in July 2006.  Id. at ¶ 55.  Thus, when the Rodriguezes continued with their usual payments, EMC did not deem them full payments and placed the monies in EMC suspense accounts.  Id.  Consequently, EMC subsequently notified the Rodriguezes that they were in default on their loan.  Id.  After the default, the Rodriguezes elected to refinance their loan with another mortgage company to escape EMC's predatory practices.  Id. at ¶ 56.  As a result, the Rodriguezes incurred over $10,000 in expenses and continue to have incorrect derogatory information on their credit histories, which has led to the denial of financing on other attempted purchases.  Id. at ¶¶ 56-58.

### 2. Nisha and Dejoy Modica

Nisha Modica, an African-American female, resides in Winchester, California with her husband, Dejoy Modica, an African-American male.  Id. at ¶ 6.  In June 2005, the Modicas took out a residential mortgage loan from Greenpoint Mortgage Funding, Inc. for a residence in Phoenix, Arizona.  Id. at ¶ 59.  In July 2005, EMC purchased the

7

Modicas' mortgage because it had been identified as a non-prime or "scratch and dent" loan with attributes meeting defendants' acquisition criteria.  Id. at ¶ 60.  Despite the fact that the Modicas consistently made timely payments to EMC, in October 2006, EMC informed the Modicas that their account was in collection due to late payments. Id. at ¶¶ 61-62.  Some weeks later, EMC wrote to the Modicas admitting that they had erroneously put the Modicas' account on delinquent status, and that the Modicas had, in fact, made timely payments.  Id. at 62.  Due to EMC's mistake, derogatory information was placed in the Modicas' credit report, which led to the Modicas being denied refinancing and being forced to pay higher interest rates on subsequent loans. Id. at ¶¶ 64-66.

### 3. Tammy Smith

Tammy Smith is an African-American female residing in Niles, Illinois.  Id. at ¶ 7. She owns a home in Baton Rouge, Louisiana.  Id. at ¶ 67.  In May 1999, Smith refinanced a loan on her Baton Rouge home through Superior Bank.  Id.  EMC purchased Smith's mortgage from Superior Bank in 2001 as a result of EMC's identification of her loan as being a non-prime or "scratch and dent" loan with attributes meeting defendants' acquisition criteria.  Id.

In February 2003, Smith mailed a bank check, which she paid for in cash, to EMC for her monthly mortgage payment.  Id. at ¶ 68.  However, EMC failed to credit Smith's February 2003 payment, leading to an erroneous late fee.  Id.  In March 2003, when Smith again made a timely mortgage payment, EMC applied the March payment to February, thereby causing Smith to incur yet another erroneous late fee.  Id.  Upon discovering the late fees in April 2003, Smith contacted EMC daily, but the error was

not corrected.  Id.  The continuing accumulation of fees resulted in over $1,000 in late fees being applied to Smith's account.  Id.

In August 2005, Smith's home was damaged by Hurricane Katrina.  Id. at ¶ 69. To compensate Smith for the damage to her home, her insurer issued a check in December 2005 for approximately $6,697, made payable to both Smith and EMC.  Id. When Smith called EMC regarding the check, EMC refused to release its interest in the funds due to the late fees on Smith's account.  Id.  In order to retrieve the monies needed to repair her home, Smith entered into a forbearance agreement with EMC in February 2006 in which she agreed to pay over $1,000 in late fees and agreed to have her monthly payment increased by over $130 per month, despite the erroneous nature of the fees.  Id. at ¶¶ 68-69.

## IV.    ANALYSIS

This court dismissed the plaintiffs' Amended Complaint on November 4, 2008, for failure "to plead facts sufficient to 'raise a right to relief above a speculative level.'" Ruling (Doc. No. 99) at 8 (quoting Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)).  The court granted plaintiffs leave to replead, but ordered that plaintiffs refile their discrimination claims only if those claims contained "sufficient factual allegations." Ruling (Doc. No. 99) at 8.  The court now considers whether plaintiffs Second Amended Complaint cures the pleading defects that caused the dismissal of the Amended Complaint.  Thus, the court begins its analysis by examining the differences between the two Complaints.

A.      Additions to the Second Amended Complaint[2]

In their Motion to Dismiss, defendants argue that the Second Amended Complaint "only rearranges the same conclusory allegations already found to be deficient, making minor changes in emphasis, without adding any factual allegations to make plaintiffs' theories of racial or ethnic animus or disparate impact any more plausible."  Memorandum in Support of Motion to Dismiss ("Mem. in Supp.") (Doc. No. 105) at 1.  Plaintiffs, on the other hand, argue that the Second Amended Complaint contains new factual allegations concerning the acquisition and servicing of plaintiffs' loans, as well as "amplified facts explaining why defendants' actions were motivated by racial or ethnic animus."  Memorandum in Opposition to Motion to Dismiss ("Mem. in Opp.") (Doc. No. 119) at 3.

1.  The Amended Complaint

In brief, plaintiffs' Amended Complaint alleged that, at the direction of Bear Stearns, EMC engaged in unfair and predatory loan servicing practices that targeted and exploited non-prime borrowers, resulting in a disparate impact on Hispanic and African-American mortgage holders.  Amended Complaint (Doc. No. 39) at ¶ 3.  It specifically alleged that EMC routinely and systematically mismanaged Hispanic and African-American customers' mortgage loans by charging unauthorized fees and refusing to properly credit payments.  Id.  These practices, in turn, caused many borrowers to become trapped in a downward spiral ending in foreclosure.  Id.

---

[2] It bears noting that the court will not recount every distinction in the two documents.  Instead, the court focuses its analysis on new allegations in the Second Amended Complaint that are relevant to the defentants' Motion to Dismiss.

10

Further, plaintiffs alleged in their Amended Complaint that this predatory loan servicing scheme was predicated on the defendants' knowledge that there exists a higher proportion of minorities in the non-prime residential lending market than in the population as a whole, and on the defendants' belief that Hispanic and African-American borrowers are less sophisticated financial consumers than Caucasian borrowers.  Id. at ¶¶ 30- 31.  Finally, the plaintiffs alleged that the defendants' actions against the named plaintiffs are part of their practice of intentionally and systematically targeting minorities for predatory loan servicing, and that the injuries of the named plaintiffs are representative of the injuries of class members.

2.  The Second Amended Complaint

In their Second Amended Complaint, plaintiffs allege the same scheme they alleged in the Amended Complaint.  That is, plaintiffs still allege that: (1) defendants intentionally sought to acquire, and did acquire, loans from the non-prime residential lending market, which contains a higher proportion of minorities than the population as a whole; (2) defendants intentionally acquired these loans in order to profit from the predatory practices defendants planned to, and did, use in servicing these loans; and (3) defendants intentionally targeted non-prime loans because defendants believed that minorities are less sophisticated financial consumers than Caucasians, and thus would be less likely or less able than Caucasian borrowers to resist predatory loan servicing practices.  Yet, while plaintiffs allege the same general scheme, they have added a number of new allegations to their Second Amended Complaint.

First, plaintiffs bring new allegations concerning the specifics of defendants' efforts to acquire non-prime loans.  For example, plaintiffs newly allege in the Second

11

Amended Complaint that, "[d]efendants' underwriting guidelines were designed or had the effect of encouraging loan originators to make non-prime loans in greater proportion to minority borrowers than to Caucasian borrowers."  2d Amd. Complaint at ¶ 15.

Plaintiffs further allege that:

> Bear Stearns also developed computerized algorithms to evaluate loan portfolios being considered for purchase in the secondary mortgage market to identify those having attributes more frequently associated with loans granted to minorities than loans granted to Caucasians.  For example, Bear Stearns used computerized algorithms to identify non-prime and "scratch and dent" loans with significant prepayment penalties or to identify non-prime and "scratch and dent" loans where the borrowers of those loans had particular credit attributes.

Id. at ¶ 16.

Second, plaintiffs bring new allegations of defendants' predatory servicing practices.  Specifically, plaintiffs allege in the Second Amended Complaint that defendants "utiliz[ed] computerized algorithms to drive collections efforts where those algorithms direct[ed] those efforts towards minorities in greater proportion than Caucasians," and that, "[t]he effect of defendants' actions was that greater numbers of minority borrowers were subject to EMC's predatory servicing practices than similarly situated Caucasian borrowers."  Id. at ¶¶ 21, 22.  As a result, plaintiffs allege, "minority borrowers were forced into delinquency or default with greater frequency than similarly situated Caucasian borrowers," and "minority borrowers were subjected to EMC's collection efforts[, including harassing phone calls and collection letters,] with greater frequency than similarly situated Caucasian borrowers."  Id. at ¶¶ 22, 23.

Finally, plaintiffs allege in the Second Amended Complaint that defendants acquired the named plaintiffs' loans because defendants identified the loans as "non-

12

prime or 'scratch and dent' loan[s] with attributes meeting defendants' acquisition criteria." Id. at ¶¶ 48, 60, 67.

      B.     Disparate Impact Claim

      Plaintiffs' first claim in both the Amended Complaint and the Second Amended Complaint is that defendants' predatory servicing practices disproportionately harmed minority borrowers, as compared to similarly situated Caucasian borrowers, in violation of the Fair Housing Act, 42 U.S.C. § 3605.  Amd. Complaint at ¶¶ 94-99; 2d Amd. Complaint at ¶¶ 86-91.  The court dismissed this claim in its November 4, 2008 Ruling because plaintiffs failed to plead facts sufficient to raise a right to relief on this claim "above a speculative level."  See Ruling (Doc. No. 99) at 8; see also Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1965 (2007).  Defendants now argue that the court should once again dismiss the claim pursuant to Rule 12(b)(6).  The court disagrees.

      In order to make out a prima facie case under the FHA on a theory of disparate impact, "a plaintiff must demonstrate that an outwardly neutral practice actually or predictably has a discriminatory effect; that is, has a significantly adverse or disproportionate impact on minorities, or perpetuates segregation."  Fair Hous. in Huntington Comm. v. Town of Huntington, 316 F.3d 357, 366 (2d Cir. 2003).

      In its previous Ruling, the court noted that plaintiffs did not offer the factual allegations necessary to render their disparate impact claim plausible.  Plaintiffs have cured this defect in the Second Amended Complaint.  Specifically, the court notes that plaintiffs now allege the following facts which were not directly alleged in the Amended Complaint: (1) defendants acquired the named plaintiffs loans because defendants

13

identified them as being non-prime or "scratch and dent" loans; (2) defendants'
predatory servicing practices forced minority borrowers into delinquency or default with
greater frequency than similarly situated Caucasian borrowers; (3) defendants'
predatory servicing practices caused minority borrowers to pay more unwarranted late
fees and other groundless charges than similarly situated Caucasian borrowers; and (4)
defendants' predatory servicing practices cause minority borrowers to receive harassing
phone calls and collections letters with greater frequency than similarly situated
Caucasian borrowers.  2d Amd. Complaint at ¶¶ 22, 23, 48, 60, 67.  These factual
allegations, taken together with the specific allegations regarding the named plaintiffs'
experiences with defendants, raise plaintiffs' disparate impact claim above a
speculative level.  That is, given the allegations in the Second Amended Complaint, the
court is unable to conclude as a matter of law that plaintiffs have no plausible disparate
impact claim.  As a result, defendants' Motion to Dismiss the disparate impact claim is
denied.

      C.    <u>Claim of Intentional Discrimination Based on Race</u>

      In both the Amended Complaint and the Second Amended Complaint, plaintiffs'
second claim is that defendants engaged in intentional racial discrimination in violation
of the 1866 Civil Rights Act, 42 U.S.C. §§ 1981 and 1982, by targeting minority
borrowers for predatory mortgage servicing.  In its November 4, 2008 Ruling, the court
held that plaintiffs failed to allege facts that would render this claim "plausible."  <u>See</u>
<u>Iqbal v. Hasty</u>, 490 F.3d 143, 157-58 (2d Cir. 2007).  Defendants now argue that,
despite the additions to the Second Amended Complaint, plaintiffs have again failed to
meet the standard as set out in <u>Iqbal</u> and <u>Twombly</u>.  The court agrees.

14

As the court noted in its previous Ruling, "[p]laintiffs allege that defendants – two major financial institutions – planned and executed a sophisticated, eight-year, multi-million-dollar scheme to defraud, and discriminate against, thousands of minority mortgage holders based on their race and ethnicity."  Ruling (Doc. No. 99) at 7.  At its heart, plaintiffs' intentional discrimination claim rests on the allegation that defendants believe minorities are less sophisticated financial consumers than Caucasians, and therefore are less likely or less able to resist predatory servicing practices.  See 2d Amd. Complaint at ¶ 18.  Factual amplification is needed to render this claim plausible, see Iqbal, 490 F.3d at 157-58, yet no factual amplification is provided.

The inadequacy of plaintiffs' allegations is most apparent when contrasted with cases in which courts have found allegations of intentional racial discrimination to be sufficient.  For example, in Barkley v. Olympia Mortg. Co., 2007 U.S. Dist. LEXIS 61940 (E.D.N.Y. Aug. 22, 2007), the plaintiffs alleged that a network of real estate companies, lenders, appraisers, and lawyers planned and executed an elaborate scheme to discriminate against minority homebuyers.  Specifically, the plaintiffs alleged that the defendants bought damaged properties at foreclosure auctions or estate sales, performed limited cosmetic repairs on those properties, and then sold the properties at double the purchase price to first-time minority homebuyers.  Moreover, the plaintiffs alleged that the defendants acted "'deliberately and with racially discriminatory intent.'" Id. at *35 (quoting the Plaintiffs' Complaint).

In considering the defendants' Motion to Dismiss, the Barkley court stated that, "[s]tanding alone, [the allegation of racial discriminatory intent] might be too conclusory . . . ."  Id. at *36.  "However," the court noted, "plaintiffs describe how defendants

15

conspired to target minorities as well as how they executed the fraudulent scheme."  Id.
For example, the plaintiffs in Barkley alleged that: (1) the defendants used advertising
featuring minority consumers; (2) the defendants placed ads in a community newspaper
serving the minority community, while not advertising in community papers that were
part of the same newspaper chain but served primarily Caucasian neighborhoods; (3)
defendants showed would-be homebuyers housing stock only in minority
neighborhoods; (4) a representative of one defendant real estate company told plaintiffs
that he believed his employer was trying to sell plaintiffs a home only in certain minority
neighborhoods; (5) defendants paired minority plaintiffs with a minority salesperson of
the same race, who told plaintiffs that he "takes care of his own"; and (6) defendants
used minority recruiters who courted potential homebuyers in church, stated that
defendants had an interest in helping African-Americans acquire a home, and acted as
a go-between for plaintiffs and defendants.  Id. at *36-37.  Given these specific factual
allegations concerning race, the court held that, "[t]aken together, these allegations
permit the inference that defendants sought to lure minority homebuyers into the
fraudulent transactions."  Id. at *37 (emphasis added).

By contrast, the plaintiffs in the present case allege no facts that render plausible
their claim that defendants intentionally targeted minority mortgage holders based on
their race.  Rather, when taken as true, plaintiffs' factual allegations indicate a scheme
in which plaintiffs' intention was to acquire and predatorily service non-prime loans, not
minority-held loans.  Plaintiffs themselves admit as much in their briefing.  See Mem. in
Opp. at 9 ("Plaintiffs allege that the reason their loans were purchased by defendants
was because they were non-prime loans").

16

While plaintiffs do allege that defendants were aware that a greater proportion of non-prime borrowers were minorities, this allegation is not enough to render the intentional racial discrimination claim plausible.  Numerous courts have held that, where the differential treatment of a group in which minorities are statistically overrepresented is based on a non-racial attribute – in this case, the attribute of being a non-prime borrower – such differential treatment alone is insufficient to show intentional racial discrimination.  See, e.g., James v. Valtierra, 402 U.S. 137 (1971); Boyd v. Lefrak Org., 509 F.2d 1110, 1112-13 (2d Cir. 1975) ("A businessman's differential treatment of different economic groups is not necessarily racial discrimination and is not made so because minorities are statistically overrepresented in the poorer economic groups"); Hallmark Developers, Inc. v. Fulton County, 466 F.3d 1276, 1284 (11th Cir. 2006) ( "Wealth is not a proxy for race").  Thus, plaintiffs' allegation that defendants were aware that minorities are overrepresented in the non-prime lending market is not sufficient to plead intentional racial discrimination.  Plaintiffs need something more.

In their Memorandum in Opposition to Defendants' Motion to Dismiss, plaintiffs argue that the Second Amended Complaint's additional facts "regarding the manner in which defendants sought out non-prime loans for acquisition and subsequent predatory servicing" satisfy their pleading burden.  Mem. in Opp. at 14.  However, plaintiffs' claims regarding defendants' computerized algorithms are insufficient for the same reason that their allegation regarding defendants' awareness of the overrepresentation of minorities in the non-prime lending market is insufficient.  That is, plaintiffs do not allege that defendants intentionally developed algorithms to target mortgages held by minorities because of the borrowers' race, but rather that they targeted loans having certain

17

financial attributes – such as significant prepayment penalties – "more frequently associated" with loans granted to minorities.  2d. Amd. Complaint at ¶ 16.  When considered in the totality of the Second Amended Complaint, such allegations do not render plaintiffs' intentional racial discrimination claim plausible.

As a result, the Second Amended Complaint does not offer the factual allegations necessary to withstand defendants' Motion to Dismiss.  Plaintiffs' only specific allegation of racial animus – that defendants believe minorities are less sophisticated financial consumers than Caucasians, and therefore are less likely or less able to resist predatory servicing practices – is conclusory and unsupported by allegations that would support such a conclusion.  Consequently, plaintiffs have failed to plead facts sufficient to "raise a right to relief above a speculative level," and therefore the intentional discrimination claim is dismissed pursuant to Rule 12(b)(6).  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).

D.    Right to Replead

The Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)."  Porat v. Lincoln Towers Cmty. Ass'n, 464 F.3d 274, 276 (2d Cir. 2006).  There are, however, circumstances in which dismissal with leave to amend is inappropriate.  See, e.g., Joblove v. Barr Labs., Inc. (In re Tamoxifen Citrate Antitrust Litig.), 429 F.3d 370, 404 (2d Cir. 2005) (holding "where amendment would be futile, denial of leave to amend is proper").  One such circumstance is where, as here, plaintiffs' amendments are "merely recycled versions of claims which had already fallen victim to a motion to dismiss."  Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 118 (2d Cir. 2007).

18

Plaintiffs have already amended their complaint twice.  Nevertheless, despite one year of discovery and a specific order from this court to include "sufficient factual allegations" in any amended complaint, plaintiffs have failed to plead a claim of intentional racial discrimination capable of withstanding a motion to dismiss pursuant to Rule 12(b)(6).  As a result, in this case, the defendant's interest in the expeditious adjudication of this litigation outweighs the plaintiffs' interest in "yet another bite at the proverbial apple."  Id.  "Three bites at the apple is enough."  Fisher v. Offerman & Co., 1996 U.S. Dist. LEXIS 14560 (S.D.N.Y. Sept. 30, 1996).  Consequently, leave to replead the claim of intentional racial discrimination is denied and that claim is dismissed with prejudice.

## V.   REMAINING MOTIONS

### A.   Motion to Strike

On January 15, 2009, defendants moved to strike (Doc. No. 107) certain portions of the Second Amended Complaint pursuant to Fed. R. Civ. P. 12(f).  When a party brings a motion to strike allegations from the pleadings pursuant to Rule 12(f), "[t]he court may strike . . . any redundant, immaterial, impertinent, or scandalous matter."  However, "motions to strike are viewed with disfavor and infrequently granted."  RSM Prod. Corp. v. Fridman, 2009 U.S. Dist. LEXIS 12898 (S.D.N.Y. Feb. 19, 2009) (quoting In re Merrill Lynch & Co., Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003)).  In fact, "[i]t is settled in this Circuit that [a motion to strike] will be denied 'unless it can be shown that no evidence in support of the allegation would be admissible.'"  Kehr v. Yamaha Motor Corp., 2008 U.S. Dist. LEXIS 99813 (S.D.N.Y. Dec. 5, 2008) (quoting Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976)).

In the present case, defendants move to strike all allegations in the Second Amended Complaint regarding delayed accrual or tolling of the statute of limitations (i.e., paragraphs 28 through 44, in their entirety), as well as the allegations and prayer concerning prospective declaratory and injunctive relief (i.e., paragraphs 24, 58, 66, 72, 77(k), 80, and 91, and prayer paragraphs 2 and 3).

With regard to the allegations concerning delayed accrual and tolling of the statute of limitations, in light of the court's ruling to dismiss plaintiffs' claim based on intentional racial discrimination, the court grants defendants' Motion to Strike insofar as the allegations regarding delayed accrual and tolling rely on that claim.  As to the remainder of paragraphs 28 through 44 of the Second Amended Complaint, the defendants' Motion to Strike is denied.  Defendants have not shown that "no evidence in support of [these] allegations would be admissible."  Kehr v. Yamaha Motor Corp., 2008 U.S. Dist. LEXIS 99813 (S.D.N.Y. Dec. 5, 2008) (quoting Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976)).

Defendants further move to strike plaintiffs' allegations and prayer concerning prospective declaratory and injunctive relief on the grounds that the named plaintiffs lack standing to seek such relief.  Defendants' premise for this argument is the fact that, due to refinancing, the named plaintiffs no longer hold loans serviced by defendants, and therefore cannot show that the prospective relief they seek is likely to redress any injury they would otherwise suffer in the future.

Plaintiffs allege in the Second Amended Complaint that "there is a high likelihood that [the named plaintiffs' current loans] could be serviced again in the future by EMC." 2d Amd. Complaint at ¶ 24.  This argument is apparently based on the allegation that

20

defendants have, in the past, vigorously sought and acquired hundreds of thousands of non-prime loans.  2d Amd. Complaint at ¶ 12.  Defendants, on the other hand, argue that "the possibility plaintiffs mention is not certain enough to satisfy Article III standards."  Reply to Motion to Strike (Doc. No. 121).  The resolution of this dispute requires a factual inquiry the court is ill-prepared to undertake given the scarceness of the current record.  For example, the court does not know whether defendants continue to acquire non-prime mortgages for servicing, and if so, how many and under what criteria.  Consequently, defendants' Motion to Strike plaintiffs' allegations and prayer concerning prospective declaratory and injunctive relief is premature, and thus is denied without prejudice.  Defendants may re-raise the issue at a more appropriate juncture.

B.    Motion to Take Judicial Notice

On May 2, 2008, defendants moved the court (Doc. No. 48) to take judicial notice of the existence, publication, and/or availability of certain news articles and annual reports, pursuant to Fed. R. Evid. 201(b)(2) and (d).  Plaintiffs opposed this Motion (Doc. No. 58), arguing that "judicial notice should be denied because these articles do not supply any 'adjudicative facts'" as defined by the Advisory Committee on Rules, and further that "judicial notice should not be taken because the articles are completely irrelevant for the purposes of this Court's ruling on this Motion."  Opposition (Doc. No. 58) at 4.  Plaintiffs supported these arguments by noting that, "courts have regularly refused to take judicial notice of the truth of a newspaper article."  Id.  The plaintiffs did not, however, contest the fact that the existence, publication, and/or availability of the articles and reports was "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.

21

201(b)(2).  The court never considered the merits of defendants' first Motion to Take Judicial Notice because the Motion was denied as moot in light of the granting of defendants' previous Motion to Dismiss.

Defendants have now renewed their Motion to Take Judicial Notice (Doc. No. 109).  The renewed Motion requests that the court take judicial notice of all the facts previously requested, i.e., the existence, publication, and/or availability of certain news articles and annual reports, as well as a document showing the changes from the first Amended Complaint to the Second Amended Complaint.  The plaintiffs have not opposed the current Motion.

Defendants' Motion to Take Judicial Notice is granted as to the articles and reports, and denied as to the document purporting to show the changes between the first Amended Complaint and the Second Amended Complaint.  The court takes judicial notice of the existence, publication, and/or availability of certain news articles and annual reports as requested by the defendants, but does not take notice of the truth of the matters asserted in those articles and reports.  See Staehr v. Hartford Fin. Servs. Group, 547 F.3d 406, 424 (2d Cir. 2008) (noting with approval that, "[t]he District Court took judicial notice of, inter alia, media reports . . . and regulatory filings" but "did not take judicial notice of the documents for the truth of the matters asserted in them, but rather to establish that the matters had been publicly asserted") (internal quotation omitted).

The court does not take judicial notice of the document purporting to show the changes between the first Amended Complaint and the Second Amended Complaint because to do so would risk confusion of the issues and is a needless presentation of

cumulative evidence.  See Fed. R. Evid. 403; see also Toth v. Grand Trunk R.R., 306 F.3d 335, 349 (6th Cir. 2002) (upholding district court's refusal to take judicial notice of facts that were barred by the Federal Rules of Evidence on other grounds).  The two Complaints are part of the public record of this case, and can easily be compared by any individual with reason to do so, without the judicial notice of this court.  Requiring the court to verify the accuracy of defendants' purported comparison by combing the two Complaints line-by-line would not only be wholly unhelpful to the adjudication of this dispute, but also a waste of scarce judicial resources.

     C.    Motion to Compel

Plaintiffs originally filed a Motion to Compel (Doc. No. 84) on September 29, 2008.  The court referred this Motion to Magistrate Judge Holly B. Fitzsimmons on October 1, 2008 (Doc. No. 90).  Judge Fitzsimmons subsequently scheduled a hearing on the Motion to Compel, but the case was dismissed prior to the hearing.  See Ruling (Doc. No. 99).

Plaintiffs have now renewed their original Motion to Compel (Doc. No. 110) and brought a new Motion to Compel (Doc. No. 122).  The court refers these Motions to Judge Fitzsimmons.

## VI.    CONCLUSION

For the reasons stated herein, the defendants' Motion to Dismiss (Doc. No. 105) is **GRANTED** in part and **DENIED** in part.  The Motion is granted as to plaintiffs' claim of intentional racial discrimination in violation of 42 U.S.C. § 1981 and 1982, which is dismissed with prejudice.  The Motion is denied as to plaintiffs' disparate impact claim

under 42 U.S.C. § 3605.  Further, defendants' Motion to Strike (Doc. No. 107) and

Motion to Take Judicial Notice (Doc. No. 109) are **GRANTED** in part and **DENIED** in

part, as discussed herein.  Plaintiffs' Motions to Compel (Doc. Nos. 110 & 122) are

hereby **REFERRED** to Magistrate Judge Holly B. Fitzsimmons.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 14th day of April, 2009.


            /s/ Janet C. Hall
                Janet C. Hall
                United States District Judge