## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SCOTT RODRIGUEZ, ET AL., | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 07-cv-1816 (JCH) |
| v. | : | |
| | : | |
| BEAR STEARNS | : | |
| COMPANIES, INC., ET AL. | : | DECEMBER 22, 2009 |
| Defendants. | : | |

### RULING RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 153), PLAINTIFFS' MOTIONS TO COMPEL (Doc. Nos. 175, 199), PLAINTIFFS' MOTION TO CERTIFY CLASS (Doc. No. 189), and DEFENDANTS' MOTION TO DEEM ADMITTED CERTAIN STATEMENTS AND MOTION TO STRIKE (Doc. No. 187)

## I.    INTRODUCTION

On November 25, 2008, plaintiffs, Scott Rodriguez, Nisha and DeJoy Modica

("the Modicas"), and Tammy Smith (collectively "the plaintiffs"), filed the Second

Amended Complaint ("2d Amd. Cmplt.") (Doc. No. 101) against defendants, Bear

Stearns Companies, Inc. ("Bear Stearns") and EMC Mortgage Corporation ("EMC")

(collectively "the defendants").[1]  In the Second Amended Complaint, plaintiffs claim

both that defendants' allegedly predatory lending practices constitute intentional racial

---

[1]  Plaintiffs filed the Second Amended Complaint after numerous previous attempts to initiate this action against defendants.  Plaintiffs first asserted their claims on December 10, 2007.  See Complaint (Doc. No. 1).  On February 5, 2008, defendants filed a Motion to Dismiss (Doc. No. 28) plaintiffs' Complaint for failure to state a claim.  In response to defendants' Motion, on March 31, 2008, plaintiffs filed an Amended Complaint (Doc. No. 39).  Defendants subsequently moved to dismiss (Doc. No. 49) the Amended Complaint on May 2, 2008.

In a Ruling dated November 4, 2008 (Doc. No. 99), the court granted defendants' Motion and dismissed the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) because plaintiffs had "failed to plead facts sufficient to 'raise a right to relief above a speculative level.'"  Ruling (Doc. No. 99) at 8 (quoting Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)).  However, the court stated that plaintiffs had "the right to reopen the case by filing, within 21 days, a [second] amended complaint asserting claims based on the alleged mishandling of their mortgage accounts," and further, that "plaintiffs [had] leave to file claims concerning their discrimination claims if they contain sufficient factual allegations."  Ruling (Doc. No. 99) at 8.

discrimination in violation of 42 U.S.C. § 1981 and 1982, and that those practices have a disparate impact on racial minorities in violation of the Fair Housing Act ("FHA"), codified at 42 U.S.C. § 3601, *et seq*.

On January 15, 2009, defendants moved to dismiss that Second Amended Complaint for failure to state a claim upon which relief can be granted.  In a Ruling dated April 14, 2009, the court granted the defendants' Motion to Dismiss with respect to plaintiffs' intentional racial discrimination claim under 42 U.S.C. sections 1981 and 1982, but denied the Motion to Dismiss with respect to plaintiffs' disparate impact claim under the Fair Housing Act.  <u>See</u> Ruling (Doc. No. 125) at 23-24.

On July 10, 2009, defendants filed a Motion for Summary Judgment with respect to the remaining disparate impact claim. <u>See</u> Defendants' Motion for Summary Judgment ("Mot. for Summ. Judg.") (Doc. No. 153).  For the reasons stated below, defendants' Motion for Summary Judgment is granted.

## II.    STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>White v. ABCO Engineering Corp.</u>, 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," <u>Anderson</u>, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000).

Generally, when assessing the record, the trial court must resolve all ambiguities

and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## III.   FACTUAL BACKGROUND[2]

### A.   The Parties and the Plaintiffs' Claim

Plaintiffs are minorities allegedly injured by defendants' discriminatory practices in the writing and servicing of residential mortgage loans.[3]  Plaintiffs Scott Rodriguez, Nisha and Dejoy Modica, and Tammy Smith are all individuals whose mortgage loans were serviced by defendant EMC.  See Plaintiff's Local Rule 56(a)(2) Statement ("L. R. 56(a)(2) Stmt.") at ¶¶ 1-3.  Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the plaintiffs bring this action to obtain relief for themselves and all other African-American and Hispanic/Latino borrowers who, beginning in January 1, 2001, had, or

---

[2] For the purposes of the instant motion, the court accepts facts undisputed by the parties and supported by evidence as true, and resolves disputed facts in favor of the party against whom the motion under consideration is made.

[3] For the purposes of this Ruling, "loan servicing" means "receiving any scheduled monthly payments from a consumer pursuant to the terms of any loan, including amounts for escrow accounts, and making the payments of principal and interest and such other payments as may be required pursuant to the terms of the loan." 2d Amd. Complaint at ¶ 20.  Servicing also includes "the administration of loan accounts, the collection of loan payments, the foreclosure of real property, the use of consumer reports, and the furnishing of information to consumer reporting agencies, . . . the collection or imposition of fees in relation to any of the foregoing."  Id.

continue to have, a non-prime residential loan serviced by the defendants ("the Class").[4]

At all times relevant to this action, defendant Bear Stearns was a Delaware corporation with its principal place of business in New York, and was a leading issuer of securities backed by near-prime and sub-prime mortgages (together, "non-prime" mortgages). 2d Amd. Complaint at ¶¶ 8, 12. Bear Stearns was acquired by JPMorgan Chase & Co. L. R. 56(a)(2) Stmt. at ¶ 4. Defendant EMC was a wholly-owned subsidiary of Bear Stearns headquartered in Lewisville, Texas and was one of the nation's largest mortgage loan servicing companies. 2d Amd. Complt. at ¶¶ 9-10, 12.

The crux of plaintiffs' remaining disparate impact claim is that defendants' predatory mortgage servicing practices disproportionately harmed minority borrowers. See 2d Amd. Cmplt. at ¶ 89. Specifically, plaintiffs allege that defendants "acquired hundreds of thousands of near-prime and sub-prime mortgage loans predominately made to Hispanics and African-Americans," and, once they had acquired the non-prime loans, engaged in a variety of predatory loan servicing practices "designed to extract as much profit as possible" from the borrowers. Id. at ¶¶ 12, 19, 21. Plaintiffs assert that the effect of defendants' actions "was that greater numbers of minority borrowers were subject to [defendants'] predatory servicing practices than similarly-situated Caucasian borrowers." Id. at ¶ 22. Further, "[w]hile defendants' practice of purchasing non-prime loans in large volume and then predatorily servicing those loans may appear outwardly race neutral, [the practice] resulted in a significantly adverse or disproportionate impact

---

[4] In addition to the Motion for Summary Judgment, there is also currently pending a Motion for Class Certification (Doc. No. 189) pursuant to Rule 23. As discussed in Part V., infra, because of the court's Ruling with respect to the Motion for Summary Judgment, it is not necessary to address the Motion for Class Certification.

on minorities . . . ."  Id. at ¶ 27.

In addition to these general Class allegations that EMC serviced non-prime loans differently than prime loans, plaintiffs also allege that the named plaintiffs – minorities who held residential mortgages serviced by EMC – suffered from EMC's predatory servicing practices.  Both the general allegations about EMC's mortgage servicing practices and the specific allegations concerning the named plaintiffs are detailed below.

> B.    Overview of EMC's Loan Servicing Procedures

Since the 1990s, EMC has serviced prime and non-prime mortgage loans.  L. R. 56(a)(2) Stmt. at ¶ 4.  EMC has numerous policies in place for servicing its loans.  With respect to outbound collection calls, EMC contacts customers with a history of delinquency and sub-prime customers on the fifth day after a payment due date, whereas EMC contacts prime borrowers beginning on the eleventh day past a payment due date.  See Loan Resolution Document Regarding Collection Calls ("Collection Call Mem."), Exh. I to Pl.'s Opposition to Mot. for Summ. Judg. ("Opposition").  EMC may also regulate fees differently "depending on the product type, lien position, loan amount, interest rate, or other factors."  Fees Document, Exh. J to Opposition.  Outbound calls to loan customers are often made by dialers that have the type of the loan – prime or non-prime – accessible within the loan file, the inference being that this may influence the way a particular call is handled.  Kaster Dep., Exh. F to Opposition, at 60.  Finally, EMC's "core strategy" documents identify three categories of loans: "low," "moderate," or "high-risk."  Core Strategy Document, Exh. K to Opposition.

Despite these documents that indicate there is a disparity between the way EMC

services prime and non-prime mortgage loans, EMC has numerous policies in place that call the two types of loans to be serviced in the same manner.  First, it is EMC's policy to perform an annual escrow account analysis on all loans that have an associated escrow account, except if the loan is more than 61 days overdue.  L. R. 56(a)(2) Stmt. at ¶ 7.  Second, EMC conducts an escrow analysis for all loans transferred to EMC within 60 days of the transfer date.  Id. at ¶ 8.  Third, for all loans, EMC's stated policy is to follow a single payment hierarchy for any posting of unspecified funds.  Id. at ¶ 9.  Finally, with respect to payment processing, EMC's policy for both prime and non-prime loans is to post payments to the customer's account the same day the payment is received.  Id. at ¶ 11.  Additionally, for both prime and non-prime loans, if a customer fails to make a payment in a timely fashion, EMC may assess a late charge to the account.  Id.  It is also EMC's stated policy that it "applies the same general procedures to prime and nonprime loans subject to the specific requirements and terms of the mortgage loan contracts and applicable law."  Bramon Decl., Exh. C to Mot. for Summ. Judg., at ¶ 3.

     C.    <u>Loan Servicing Procedures Concerning the Named Plaintiffs</u>

         1.    Scott Rodriguez

Plaintiff Scott Rodriguez is a Hispanic male who resides in Waterbury, Connecticut with his wife, Heather Rodriguez, in a home they own.  2d Amd. Cmplt. at ¶¶ 5, 45.  The Rodriguezes refinanced their residential mortgage loan in 2005 with Town and Country Credit Corporation.  L. R. 56(a)(2) Stmt. at ¶ 17.  In 2005, EMC purchased the loan from Town and Country Credit Corporation and assumed all responsibility for servicing the loan.  Id. at ¶ 20.  EMC's obligation to service the loan

included paying the Rodriguezes' property taxes to the City of Waterbury out of an escrow account kept for that purpose. Id. at ¶¶ 18, 21.

When EMC assumed servicing of the Rodriguezes' loan, they failed to receive notice of the July 2005 tax bill (for 2004 real estate taxes). Id. at ¶ 21. In fact, the information EMC received upon assumption of the loan indicated that the 2004 taxes had already been paid. Id. Because EMC was operating under the faulty assumption that the 2004 property taxes had been paid, the standard escrow account analysis that EMC performed on the Rodriguezes' loan in 2005 revealed surplus funds in the amount of $690.57. Id. at ¶ 22, 23. EMC issued a check to the Rodriguezes' in that amount, and they cashed the check. Id. at ¶ 23, 24.

In or around March 2006, the City of Waterbury issued a Notice of Lien to the Rodriguezes which stated that a portion of the 2004 tax bill ($1,450.63 plus interest) had not been paid. Id. at ¶ 25. EMC rendered a payment of $1,583.43 to the City of Waterbury on May 3, 2006, to cover the owed amount. Id. at ¶ 26. After this payment was made, EMC performed another escrow account analysis which revealed that the Rodriguezes' escrow account had a shortage of $1,660.23. This shortage necessitated increasing the Rodriguezes' monthly mortgage payments by $138.35. Id. at ¶ 27.

Although they were informed that their monthly mortgage payments had increased, the Rodriguezes refused to pay the new figure and instead continued the payment of $1,023.00 on a monthly basis. Id. at ¶ 29. The terms of the Rodriguezes' loan provide that the "[b]orrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum. . . to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority

-7-

over this Security Instrument as a lien or encumbrance on the property. . . ."  Id. at ¶ 28.

Because the Rodriguezes did not pay the increased monthly amount, EMC held them in

default on the mortgage loan which caused late charges and credit reporting.  Id. at ¶

35.

After being held in default, the Rodriguezes elected to refinance their loan with

another mortgage company to escape EMC's predatory practices.  2d Amd. Cmplt. at ¶

56.  As a result, the Rodriguezes incurred over $10,000 in expenses and continue to

have incorrect derogatory information on their credit histories, which has led to the

denial of financing on other attempted purchases.  Id. at ¶¶ 56-58.  In December 2007,

Scott Rodriguez filed this lawsuit alleging that EMC's servicing practices have had a

disparate impact on Hispanic and African-American borrowers.  L. R. 56(a)(2) Stmt. at ¶

40.  Heather Rodriguez, Scott's wife, is non-Hispanic Caucasian, and is not a party to

the lawsuit despite having been involved with the loan servicing issues described

herein.

2.      Nisha and Dejoy Modica

Nisha Modica, an African-American female, resides in Winchester, California

with her husband, Dejoy Modica, an African-American male.  2d Amd. Cmplt. at ¶ 6.  In

June 2005, the Modicas took out a residential mortgage loan from Greenpoint Mortgage

Funding, Inc. for a residence in Phoenix, Arizona.  Id. at ¶ 59.  In or around September

2005, EMC began servicing the Modicas' mortgage.  L. R. 56(a)(2) Stmt. at ¶ 47.

Under the terms of their mortgage loan, the Modicas had four payment options.

They could pay (1) the minimum monthly payment due, (2) an interest only payment, (3)

a full principal and interest payment based upon the remaining term of the account, or

-8-

(4) a full principal and interest payment based on a 15-year term equity build-up.  Id. at ¶ 46.  The Modicas typically made their monthly payments through their bank, and were therefore unable to specify which of the four payment options they were selecting for that payment period.  Id. at ¶ 49.  Additionally, the Modicas frequently did not pay an amount that matched any of the four payment options.  Id.

On or around August 9, 2006, EMC sent a statement to the Modicas that provided them with the payment amount owed for each of their four payment options for that payment period.  Id. at ¶ 51.  On or around September 12, 2006, the Modicas remitted payment for $1,350 – a figure that was greater than the minimum monthly payment ($498.80) and interest only payment ($1,345.81), but less than the principal and interest payment ($1,395.02).  Id. at ¶¶ 51, 53.  EMC applied the remitted funds as a "minimum monthly option" payment for two months (September and October), and applied the remaining $352.40 to the principal.  Id. at ¶ 54.

The Modicas contacted EMC on October 3, 2006, and instructed EMC that they wanted the funds applied to the October bill to be applied instead to the principal.  Id. at ¶ 55.  In attempting to honor that request, EMC erroneously applied the entire September 12 payment to the principal, thus nullifying the record of the payment of the September bill.  Id.  As a result, the Modicas appeared to be in default for the September pay period, and the payment was reported as "late" to credit bureaus.  Id. at ¶ 56.  EMC did not actually assess any late fee in connection with the September payment.  Id. at ¶ 59.

The Modicas contacted EMC and disputed the report made to the credit bureaus.  Id. at ¶ 57.  After the implementation of several internal procedures, including

the opening of an "LMTCBR Task," the credit reporting issue was eventually resolved. Id. at ¶ 60.  The Modicas ultimately paid off the loan serviced by EMC, and in their application for refinancing with another Mortgage provider, no negative credit reporting was evident.  Id. at ¶ 62, 63.  In December, 2007, the Modicas filed this lawsuit alleging that EMC's servicing practices had a disparate impact on Hispanic and African-American borrowers.  Id. at ¶ 63.

        3.     Tammy Smith

Tammy Smith is an African-American female residing in Niles, Illinois.  2d Amd. Cmplt. at ¶ 7.  She owns a home in Baton Rouge, Louisiana.  Id. at ¶ 67.  In May 1999, Smith refinanced a loan on her Baton Rouge home through Superior Bank.  Id.  EMC began servicing the loan at some point in 2002.  L. R. 56(a)(2) Stmt. at ¶ 68.  The terms of the loan call for monthly payments to be made on the first of each month with a 15 day grace period.  Id. at ¶ 69.  The loan also provides that, should the borrower not pay the full amount of each monthly payment when it is due, the borrower will be in default, which will result in late charges.  Id.

Although Tammy Smith's mother, Florence W. Smith, typically made the monthly mortgage payment by personal check, on February 10, 2003, Florence Smith obtained a cashier's check from Hibernia Bank issued to EMC mortgage Corporation for the February payment.  Id. at ¶¶ 72, 73.  The cashier's check did not contain any account number.  Id.  This cashier's check was never cashed by EMC, and Smith ultimately received a refund from Hibernia Bank for the amount of the check.  Id.  Smith received confirmation from the Postal Service that the check had been delivered to EMC.  See Smith Dep., Exh. Z to Opposition at 187.

Having no record of receiving the check, EMC failed to credit Smith's February 2003 payment, leading to a late fee.  2d Amd. Cmplt at ¶ 68.  In March 2003, when Florence Smith again made a timely mortgage payment within the 15-day grace period, EMC applied the March payment to February, thereby causing Smith to incur yet another erroneous late fee because it appeared that she had not paid the March bill in a timely fashion.  Id.  Upon discovering the late fees in April 2003, Smith contacted EMC, but the error was not corrected.  See Smith Dep., Exh. Z at 211.  The continuing accumulation of fees resulted in over $1,000 in late fees being applied to Smith's account.  Id. at 272.

In August 2005, Smith's home was damaged by Hurricane Katrina.  2d Amd. Cmplt. at ¶ 69.  To compensate Smith for the damage to her home, her insurer issued a check in December 2005 for approximately $6,697, made payable to both Smith and EMC.  Smith Dep. at 91.  When Smith called EMC regarding the check, EMC refused to release its interest in the funds due to the late fees on Smith's account.  Id.  In order to retrieve the monies needed to repair her home, Smith entered into a forbearance agreement with EMC in February 2006 in which she agreed to pay over $1,000 in late fees and agreed to have her monthly payment increased by over $130 per month.  2d Amd. Cmplt. at ¶¶ 68-69.

Smith refinanced her mortgage in March 2006.  Opposition at 17.  In order to refinance her mortgage, Smith was forced to pay standard refinance charges as well as the remaining unpaid late charges and corporate advance pees, which totaled $1,035.07 and $48.85, respectively.  Id.  In December, 2007 Smith filed this lawsuit alleging that EMC's servicing practices had a disparate impact on Hispanic and African-

-11-

American borrowers.  L. R. 56(a)(2) Stmt. at ¶ 78.

## IV.    DISCUSSION

In order to make out a prima facie case under the FHA on a theory of disparate impact, "a plaintiff must demonstrate that an outwardly neutral practice actually or predictably has a discriminatory effect; that is, has a significantly adverse or disproportionate impact on minorities, or perpetuates segregation." Fair Hous. in Huntington Comm. v. Town of Huntington, 316 F.3d 357, 366 (2d Cir. 2003). Specifically, a plaintiff must show "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." Tsombanidis v. West Haven Fire Dep't, 352 F.3d 565, 575 (2d Cir. 2003).  If a plaintiff makes such a prima facie showing, then the burden shifts to the defendant "to prove that its actions furthered, in theory and in practice, a legitimate, bona fide. . . interest and that no alternative would serve that interest with less discriminatory effect." Salute v. Stratford Greens Garden Apartments, 136 F.3d 293, 302 (2d Cir. 1998).

A.    Outwardly Neutral Practices

The Supreme Court, in addressing a disparate impact employment claim, has held: "It is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.  Rather, the employee is responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities." Smith v. City of Jackson,

<u>Miss.</u>, 544 U.S. 228, 241 (2005).[5]  This requirement that plaintiffs identify the targeted

practice with sufficient particularity ensures that defendants have adequate notice of

precisely what actions they must defend.  <u>Id.</u>

Defendants argue that plaintiffs have not identified any outwardly neutral practice

of EMC, but instead have only pointed to several unique and individual situations

involving the named plaintiffs.  <u>See</u> Mot. for Summ. Judg. at 7-11.  Plaintiffs, however,

contend that this court has already ruled that the plaintiffs set forth allegations of a

facially neutral practice which could plausibly result in a disparate impact on minorities

by denying the Motion to Dismiss as to the disparate impact claim.  <u>See</u> Opposition at 5

(citing Ruling).  The court agrees with defendants that the mere fact that plaintiffs'

complaint survived the Motion to Dismiss does not necessarily mean that summary

judgment is inappropriate.[6]  For the reasons that follow, the court ultimately concludes

---

[5] Although the <u>Smith</u> decision involves an employment discrimination dispute arising under the ADEA and drawing upon Title VII, the Court's analysis of Title VII disparate impact claims applies to such claims under the FHA.  <u>See</u> <u>Tsombanidis v. West Haven Fire Dep't</u>, 352 F.3d 565, 575 (2d Cir. 2003) ("When examining disparate impact claims under the FHAA and ADA, we use Title VII as a starting point.") (citations omitted).

[6] At the pleading stage, a plaintiff must only meet Fed. R. Civ. Proc. 8(c)'s requirement of asserting "factual allegations sufficient 'to raise a right to relief above the speculative level.' "  <u>Boykin v. KeyCorp</u>, 521 F.3d 202, 213 (2d Cir. 2008) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  By contrast, once a party moving for summary judgment has established that there are no genuine issues of material fact, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," <u>Anderson</u>, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000).  That this court declined to grant defendants' Motion to Dismiss in its April 14, 2009 Ruling (Doc. No. 125) therefore has nothing to do with whether summary judgment is appropriate because the requirements a plaintiff must meet are different at each stage.
    Furthermore, in their Second Amended Complaint, plaintiffs alleged EMC engaged in "knowingly understaffing critical business units within EMC such as those responsible for 'boarding' incoming loans, for processing incoming mail, and for processing borrower calls and complaints; designing and implementing systems to maximize fee revenue at the expense of borrowers; utilizing computerized algorithms to drive collections efforts where those algorithms direct those efforts towards minorities in greater proportion than Caucasians; intentionally misrepresenting EMC's entitlement to or the amounts of fees owed by borrowers; imposing unwarranted fees and costs; pyramiding of late fees; unnecessary force-placing of insurance; failing to properly credit payments; reporting of unwarranted derogatory

that the plaintiffs have not sufficiently identified the EMC facially neutral policy that is the subject of this litigation.

Defendants assert that the plaintiffs have only put forth evidence relating to "isolated and individual incidents arising out of facts unique to each [of the named] plaintiffs' particular circumstances."  Mot. for Summ. Judg. at 8.  The court agrees that, had the plaintiffs in fact only offered evidence regarding EMC's loan servicing with respect to Scott Rodriguez, Nisha and Dejoy Modica, and Tammy Smith, it would be easy to conclude that plaintiffs failed to set forth a material issue of fact that there is an extant EMC policy that could be the subject of a disparate impact claim.  The allegations relating to the named plaintiffs, viewed in isolation, would not give rise to an FHA claim.  Contrary to defendants' assertions, however, the plaintiffs have not identified the particular errors made in the servicing of the named plaintiffs' loans as the targeted policy of their suit; instead, they identify the targeted policy as EMC's overall practice of servicing non-prime loans differently from prime loans.  See, e.g., 2d Amd. Cmplt. at ¶ 90 ("The discriminatory servicing perpetrated by defendants had a disparate impact on Hispanics and African-Americans, including Plaintiffs and Class Members, whose loans were serviced by the Defendants."); Opposition at 18 ("[T]he issue is the disparate impact on minorities that is caused by predatory servicing of non-prime

---

information regarding borrowers to credit reporting agencies; and failing to properly administer escrow accounts."  2d Amd. Cmplt. at ¶ 21.  In deciding defendants' Motion to Dismiss, the court took these allegations as true.  See April 14,2009 Ruling at 2 (citing Hoover v. Ronwin, 466 U.S. 558, 587 (1984)).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 256.  Plaintiffs have failed to put forth evidence to support these allegations, and the court therefore stands in a different posture in addressing the Motion for Summary Judgment than it did in addressing the Motion to Dismiss.

-14-

loans.").

Whether *this* policy (of servicing non-prime loans differently from prime loans) has been identified with sufficient particularity to make out a prima facie FHA claim is a difficult question.  This case is distinct from other cases in which courts have denied disparate impact claims where plaintiffs did not identify with sufficient particularity the *specific* practices that allegedly caused the disproportionate treatment of minorities. See, e.g., Smith, 544 U.S. at 241 (denying disparate impact claim under the ADEA because plaintiffs did not identify "any specific test, requirement, or practice within the pay plan that has an adverse impact on older workers").  Unlike Smith where plaintiffs failed to identify a particular practice of the defendant against one particular individual, plaintiffs here have identified that the policy they challenge is EMC's policy to treat prime and non-prime loans differently.  Likewise, this case is distinct from other cases in which plaintiffs challenge only a singular act against one particular individual, not a systematic policy.  See, e.g., Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 53 (2d Cir. 2002) (denying disparate impact claim under the FHA because plaintiff did "not challenge a facially neutral policy or practice; it challenged one specific act: the denial of a special-use permit for the Formisano property.").  Unlike Middletown, plaintiffs here do not allege that one singular act by EMC violates the FHA; they instead claim that the violation of the FHA stems from the overall policies EMC has in place with respect to servicing prime and non-prime loans.

Although this case does not present either of the archetypal scenarios that cause a plaintiff to fail to meet this first requirement for stating a prima facie disparate impact claim (namely, the scenarios where (1) plaintiffs have failed to identify any practice that

could account for the disparate impact, or (2) plaintiffs only identify one isolated act of the defendants), the case is also dissimilar from the majority of viable FHA claims.  In the majority of FHA disparate impact cases, plaintiffs contend that a clearly discernible and often official policy creates the disparate impact.  See, e.g., Tsombanidis, 352 F.3d 565 (FHA disparate impact challenge to a specific West Haven fire code provision); Khalil v. Farash Corp., 277 Fed. Appx. 81 (2d Cir. 2008) (FHA disparate impact challenge to explicit rule of landlord that prohibited children from playing on grounds surrounding apartment building).  Here, however, the plaintiffs challenge a policy that is more covert, namely that EMC treats prime loans differently from non-prime loans.  In as much as EMC's stated policy is to apply "the same general procedures to prime and nonprime loans," the plaintiffs must themselves weave individual loan servicing practices together to reveal the broader policy that they allege causes the disparate impact.  Bramon Decl. at ¶ 3.  The plaintiffs attempt to do this by offering evidence of several EMC practices --different call schedules for prime and non-prime loans, different fee regulations for prime and non-prime loans, etc. -- that, viewed together, can create the inference of a general policy.  That plaintiffs rely on evidence of these individual practices to support their allegation that EMC employs this broader policy to distinguish between prime and non-prime loans may make it seem as if they "have no evidence [of] any facially neutral policy or practice," and that their FHA claim should fail. Mot. for Summ. Judg. at 8.  Yet simply because plaintiffs point to a series of small details concerning loan servicing to support their claim does not mean that they fail to identify a policy for purposes of the FHA.

This case resembles Miller v. Countrywide Bank, N.A., 571 F. Supp. 2d 251 (D.

Mass 2008), in which plaintiffs challenged the broad discretion mortgage lenders employed in pricing loans and fees.  The defendant mortgage lenders asserted that the broad discretion they grant to retail salesmen, independent brokers, and correspondent lenders to add various charges and fees "is really no policy at all."  Id. at 257.  After all, the entire premise of plaintiffs' claim was that the *absence* of a policy allowed for excessive discretion which yielded a discriminatory impact on minority borrowers.  Nonetheless, the court in Miller held that plaintiffs had identified a sufficiently specific policy because "allowing this 'practice' to escape scrutiny would enable companies responsible for complying with anti-discrimination laws to 'insulate' themselves by 'refraining from making standardized criteria absolutely determinative.'" Id. at 258 (citations omitted).  Likewise, were this court to require the plaintiffs to identify an express policy to maintain their claim, it would inevitably enable companies to insulate themselves from anti-discrimination laws by refraining from making policies explicit and only implementing a series of small, individualized practices.  Such an outcome would contradict the very purpose of the FHA.  See Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 935 (2d Cir. 1988) (finding that the FHA is "part of a coordinated scheme of federal civil rights laws enacted to end discrimination"); see also 42 U.S.C. § 3601 ("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.").

Nonetheless, while the court concludes that an FHA plaintiff need not identify an *express* policy in order to make out a prima facie disparate impact claim and can instead point to numerous practices that demonstrate a broader policy that is the target of the claim, the court also concludes that plaintiffs have failed to put forth evidence to

-17-

suggest a genuine issue of material fact exists as to whether that broader policy exists

in this case.  Plaintiffs rely solely on three EMC loan servicing practices in its attempt to

identify a general EMC policy to service non-prime loans differently from prime loans.

First, EMC places collection calls to historically delinquent customers and sub-prime

customers on the fifth day after a payment due date has passed, but calls prime

borrowers only upon the eleventh day after a payment due date has passed.  <u>See</u>

Collection Call Mem., Exh. I to Opposition.  Second, EMC may adjust fees based upon

whether a loan is prime or non-prime as state and federal law allows for the different

regulation of fees according to loan type.  <u>See</u> Document Entitled "Fees and Charges,

Including Late Charges and Prepayment Penalties, Under State and Federal Law,"

("Fees Doc.") Exh. J to Opposition (asserting that "[f]ees and charges may be regulated

differently depending on the product type, lien position, loan amount, interest rate, or

other factors").  Third, EMC's "core strategy" documents identify three categories of

loans: "low," "moderate," or "high-risk."  Core Strategy Document, Exh. K to Opposition.

Despite plaintiffs' contentions, the court concludes that the evidence of these

three facts does not create a material issue of fact as to an EMC policy to treat non-

prime loans differently from prime loans, as is required to make out a prima facie FHA

claim.  As an initial matter, there is no evidence that any of the named plaintiffs have

themselves been injured by one of these practices.  Furthermore, the evidence itself is

scant and unpersuasive.  That EMC *"may"* regulate fees differently "depending on the

product type, lien position, loan amount, interest rate, or other factors" does not indicate

whether EMC *actually* regulates fees based upon product type.  <u>See</u> Fees Doc.

(emphasis added).  Likewise, the fact that EMC categorizes loans as "low," "moderate,"

and "high-risk" does not demonstrate how EMC services those categories of loans differently.  See Core Strategy Document.  The only real practice that plaintiffs point to in support of their claim that EMC services non-prime loans differently from prime-loans is that EMC calls its sub-prime borrowers on the fifth day after a payment due date, not after the eleventh day.  See Collection Call Mem.  However,  plaintiffs' disparate impact claim cannot stand on this evidence alone.  A disparate impact claim that is entirely predicated on EMC's collection call schedule cannot be maintained because nothing in the record indicates that the named plaintiffs were themselves subject to this practice. Furthermore, as discussed above, *supra* at 16-17, while it is conceivable that a plaintiff may identify a facially neutral practice by way of pointing to a number of smaller practices, a plaintiff cannot point to one isolated practice and maintain that this one isolated practice requires the inference of a larger policy.  Therefore, the evidence plaintiffs have set forth does not create a genuine issue of material fact as to the existence of an EMC policy to treat prime loans differently from non-prime loans. Accordingly, because plaintiffs have failed to identify a facially neutral practice, they have failed to assert a prima facie FHA disparate impact claim, and the Motion for Summary Judgment should be granted.

The court acknowledges that whether plaintiffs have sufficiently identified a facially neutral practice is a close question.  Nonetheless, even if the court had concluded that plaintiffs had met this requirement, the court would still have granted the Motion for Summary Judgment because, as is discussed in greater detail below, the plaintiffs do not identify a genuine issue of material fact with respect to the remaining element of their disparate impact claim.

B.    Disproportionate Impact on Minorities

Even if EMC's loan servicing amounts to a sufficiently specific policy for purposes of maintaining an FHA claim, defendants argue that the plaintiffs have not put forth any evidence to establish a genuine issue of material fact as to whether this policy disproportionately impacts minorities.  Mot. for Summ. Judg. at 11-14.  "When establishing that a challenged practice has a significantly adverse or disproportionate impact on a protected group, a plaintiff must prove the practice 'actually or predictably results in. . . discrimination.'  A plaintiff has not met its burden if it merely raises an inference of discriminatory impact." Tsombanidis, 352 F.3d at 575.

1.    Determining the Comparison Plaintiffs Must Make to Create a Genuine Issue of Material Fact as to Whether Defendants' Policy has a Disproportionate Impact

To maintain that there is a genuine issue of material fact as to whether a challenged practice has a "disproportionate impact on a protected group," a plaintiff must provide a "comparison between two groups–those affected and those unaffected by the facially neutral policy." Id. (citations omitted).  Before evaluating whether plaintiffs have set forth facts that demonstrate there is a genuine issue of material fact for trial, it is therefore necessary to determine which groups it would be appropriate to compare in this case.  In Tsombanidis, a case in which plaintiffs asserted that recovering alcoholics were more severely impacted by a policy than those who were not recovering alcoholics, the court determined that the proper comparison was between "(1) recovering alcoholics and recovering drug abusers. . . and (2) people who are neither recovering alcoholics nor recovering drug abusers."  Id. at 577.  Indeed, courts have generally held that the proper comparison that plaintiffs must undertake is

-20-

between how the targeted policy impacts (1) the group protected under the FHA and (2) unprotected groups that are otherwise similarly situated.  See, e.g., Schwarz v. City of Treasure Island, 544 F.3d 1201, 1218 (11th Cir. 2008) (upholding decision of district court to grant summary judgment in favor of defendants because plaintiffs failed to offer proper comparison of housing rule's impact on handicapped with housing rule's impact on non-handicapped); Gamble v. City of Escondido, 104 F.3d 300, 306 (9th Cir. 1997) (same).

Plaintiffs erroneously assert that "proper analysis also demands a comparison of the percentage of minority-owned non-prime loans being serviced by EMC to the percentage of minorities in the total population of loans being serviced."[7]  Opposition at 20.  Given the relevant precedent's emphasis that a comparison should be between protected and unprotected groups, the proper analysis would compare how EMC's loan servicing policies impact African-American and Hispanic borrowers with how those policies impact non-minority borrowers.[8]

---

[7] Even though the FHA and relevant case law make it clear that this is not the appropriate comparison, the fact that plaintiffs assert that this is the appropriate comparison is immaterial considering that plaintiffs put forth no comparative evidence whatsoever to support this characterization of their disparate impact claim.

Furthermore, not only do the plaintiffs fail to identify the appropriate comparison under the FHA, they also ridicule defendants' assertion that no such comparison has been offered as the "ultimate showing of shamelessness."  Opposition at 18.  In this court's view, such "argument" style is completely unpersuasive and lacks professionalism.

[8] Whether prime and non-prime borrowers are similarly situated -- and should therefore be aggregated for purposes of comparing the relevant populations -- presents a difficult issue of law.  Given that the plaintiffs' claim is predicated on the argument that EMC's policies with respect to non-prime loans had a disparate impact on minorities because minorities made up a larger share of non-prime borrowers, a comparison of how minority and non-minority *non-prime borrowers* were impacted would inevitably reveal that no disproportionate effect on that minority group exists.  However, because plaintiffs have not provided any evidence whatsoever to demonstrate a disproportionate effect, even assuming that prime and non-prime borrowers should be aggregated in the analysis, the court need not determine whether prime and non-prime borrowers should be treated alike for FHA purposes.

2.      Evidence Offered That Relates to the Proper Comparison

a.      Statistical Evidence

As plaintiffs' Opposition itself indicates, "[S]tatistical proof almost always occupies center stage in a prima facie showing of a disparate impact claim." Opposition at 5 (quoting Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 160 (2d Cir. 2001)).  FHA claims that survive summary judgment almost invariably include statistical support.  In Huntington Branch, NAACP, for example, the Second Circuit reversed the district court's ruling and upheld an FHA claim due largely to the significant amount of statistical evidence that indicated the targeted policy had a disparate impact on minorities.  Huntington Branch, NAACP, 844 F.2d at 926.  There, plaintiffs challenged the Town's affordable housing shortage under the FHA as creating a disparate impact on minorities.  The court found it dispositive that 7% of all Huntington families required subsidized housing, while 24% of black families needed such housing; effectively, the Town's affordable housing policy had three times the impact on blacks than on the overall population.  Id. at 929.  The court also largely based its decision on the fact that 28% of minorities in the town could qualify for affordable housing, compared with only 11 % of whites.[9]  Id. at 938.  Driven largely by this statistical data, the court concluded that the "disproportionate harm to blacks. . . create[s] a strong prima facie showing of discriminatory effect."  Id.

In denying an FHA claim in Tsombanidis, the Second Circuit again made it clear

---

[9] The district court had relied on the fact that 22,160 whites, but only 3,671 minorities, had incomes that qualified them for affordable housing.  Although this demonstrated that more whites would be effected by the affordable housing policy, the Second Circuit determined that the proper analysis entailed proportional statistics (the percentage of the two compared groups that were in the group affected), not absolute numbers.  Huntington Branch, NAACP, 844 F.2d at 938.

that statistical analysis plays a vital role in disparate impact cases:

> The plaintiffs could have made a prima facie case of disparate impact by providing statistical evidence (1) that x% of all of the recoverings in [the city] need (or have good reason) to live in the "group settings" prohibited by the [ordinance] at issue, (2) that y% of all of the non-recoverings in [the city] need (or have good reason) to live in such group settings prohibited by the [ordinance], and, crucially, (3) that x is significantly greater than y.

Tsombanidis at 577.  Other circuits have also heavily weighed the presence or absence of statistical evidence.  See, e.g., Betsey v. Turtle Creek Assocs., 736 F.2d 983, 987-88 (4th Cir. 1984) (holding that plaintiffs had established a prima facie case where statistics demonstrated that a policy led to the eviction of 54.3% of the non-white tenants in a particular building, but only 14.1% of the white tenants).

The plaintiffs here have not offered any statistical evidence whatsoever.  As defendants correctly assert, there is no evidence that (1) any EMC practice disproportionately impacts minorities compared with other similarly situated groups subject to the same practices; (2) minority borrowers' loans are subject to a greater frequency of misapplied payments than non-minority borrowers' loans; (3) EMC minority borrowers are forced into delinquency with greater frequency than similarly situated non-minority borrowers; (4) EMC practices cause minority borrowers to pay more unwarranted fees than similarly situated non-minority borrowers; or (5) that EMC practices caused minority borrowers to receive harassing calls and letters more frequently than similarly situated non-minority borrowers.  Mot. for Summ. Judg. at 12-13.  As discussed below, plaintiffs attempt to evade the fact that they have provided no meaningful statistical data in a variety of ways.

i.      Discovery and FRCP 56(f) Motion

Plaintiffs assert that no statistical support was offered because the *defendants* possess this data and have so far refused to produce it through discovery.  See Opposition at 5.  In support of this argument, plaintiffs have filed a Declaration pursuant to FRCP 56(f) seeking further time to carry out discovery.  See Mayer Decl. ("Rule 56(f) Decl."), Exh. B to Opposition.  In that Declaration, the plaintiffs acknowledge that "statistics and analytical evidence are critical cornerstones of any Fair Housing disparate impact claim," and they urge that the defendants must provide them with such data.  Id. at ¶ 9.  Specifically, in an August 27, 2009 Motion to Compel (Doc. No. 175), plaintiffs asserted that, despite their "specific and narrowly-tailored discovery requests seeking relevant documents and information from which they can derive the [statistical] data supporting their claims, Defendants have refused to produce this essential information."  Mem. in Support of Mot. to Compel (Doc. No. 176) at 3.

The Second Circuit has held that "Rule 56(f) requires the opponent of a motion for summary judgment who claims to be unable to produce evidence in opposition to the motion to file an affidavit explaining: (1) the nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; and 2) how those facts are reasonably expected to create a genuine issue of material fact; and 3) what efforts the affiant has made to obtain those facts; and 4) why those efforts were unsuccessful."  Burlington Coat Factory Warehouse Corp. v. Esprit de Corp., 769 F.2d 919, 926 (2d Cir. 1985).  An analysis of these factors reveals that plaintiffs' Rule 56(f) Declaration is insufficient, and the court therefore finds that it may rule upon the Motion for Summary Judgment without further discovery by the plaintiffs.

First, plaintiffs fail to demonstrate how their discovery request is reasonably expected to create a genuine issue of material fact as to whether EMC's policies disproportionately impact minorities.  Plaintiffs identify the nature of their uncompleted discovery as "data sets regarding the fees charged on minority borrowers' loans during the Class period."  Rule 56(f) Decl. at ¶ 11.  Even if this information existed, it would not assist plaintiffs because it does not speak to the relevant comparison that must be made to support a disparate impact claim, namely, the comparison between *minority* and *non-minority* EMC borrowers.  Even if such data sets revealed that particular fees were placed on *minority borrowers'* loans during the Class period, this would not create a genuine issue of material fact as to whether a disproportionate impact exists because plaintiff has not come forward with (nor sought in their Motion to Compel) any comparative evidence through which to demonstrate the fees placed on *non-minority borrowers'* loans.  Plaintiffs' discovery requests are therefore insufficient under Rule 56(f).  See Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy, 891 F.2d 414, 422 (2d Cir. 1989) (denying discovery request because, "even if plaintiffs had obtained what they stated would be uncovered, the information would have been insufficient to defeat summary judgment"); Kawski v. Johnson & Johnson, No. 08-cv-4608, 2009 WL 2750691 at *1 (2d Cir. Sep. 1, 2009) ("We review a district court's denial of a motion under Rule 56(f) for abuse of discretion, and will not reverse where a plaintiff has failed to show 'how the facts sought are reasonably expected to create a genuine issue of material fact.'") (citations omitted).

Second, plaintiffs have not demonstrated what efforts they have made to obtain the requested materials or why those efforts have been unsuccessful.  Plaintiffs make

the blanket assertion that, "throughout the course of litigation [they] have continually sought discovery on the individual and class claims to support the allegations of a disparate impact against minority mortgage holders."  Rule 56(f) Decl. at ¶ 11.  The court disagrees.  Although the court's Scheduling Order called for all Motions to Compel to be filed "within 30 days after the due date of the response," and called for all discovery to be completed by April 15, 2009, plaintiffs did not file a Motion to Compel seeking statistical data until August 27, 2009.  See Scheduling Order Regarding Case Management Plan (Doc. No. 38) at 1-2; Mot. to Compel (Doc. No. 175).  Furthermore, this Motion to Compel was made almost two years after the suit was initially filed in late 2007.  Although the glacial pace of this case is not entirely attributable to plaintiffs, plaintiffs could certainly have been more expeditious throughout the discovery process.  Because "[r]equests for discovery in the face of motions for summary judgment put forth by parties who were dilatory in pursuing discovery are disfavored," and because plaintiffs have had extensive opportunity to pursue discovery in this matter, the court declines to allow plaintiffs further discovery.  Paddington Partners v. Bouchard, 34 F.3d 1132, 1139 (2d Cir. 1994) (denying 56(f) request for further discovery because plaintiff had "offered very little in the way of support for its claim that its access to discovery was denied or diligently pursued"); see also Jaiyeola v. Carrier Corp., No. 08-cv-3786, 2009 WL 3462483 at *2 (2d Cir. Oct. 29, 2009) (denying motion under Rule 56(f) largely because plaintiff "had ample time -- during which he retained counsel -- to pursue the requested discovery").

Third, the statistical data that plaintiffs request in their Rule 56(f) Declaration extends beyond that evidence which EMC has in its "possession, custody, or control."

FED. R. CIV. P. 34 (allowing a party to serve a request on its opponent to "produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control. . . "); see also Mem. in Opp. to Plaintiffs' Mot. to Compel (Doc. No. 194) at 3.  In their Third Set of Document Requests, plaintiffs requested that defendants "provide a database or spreadsheet in *electronic format*" that indicates, *inter alia*, the mortgage loan number, the mortagor's race, and the loan type.  See Defs.' Objections and Responses to Pls.' Third Set of Doc. Requests, Exh. 1 to Mot. to Compel Responses to Third Request (Doc. No. 176) at 5 (quoting plaintiffs' Request for Documents) (emphasis added).  On December 15, 2009, in response to a request of the court at oral argument, defendants represented to the court that "no such information in the format requested by plaintiffs existed."  See Defs.' December 15, 2009 Letter at 1.  Therefore, under Federal Rule of Civil Procedure 34, EMC has no obligation to produce such material.  See Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F. 3d 130, 138 (2d Cir. 2007) (citing FED. R. CIV. P. 34 and finding that a "party is not obliged to produce. . . documents that it does not possess or cannot obtain").

Finally, during a December 1, 2009 conference call with Magistrate Judge Fitzsimmons, plaintiffs themselves indicated that the pending discovery requests and Motions to Compel are not critical to resolving the Motion for Summary Judgment.  See Audio Recording of December 1, 2009 Conference Call ("Recording") (transcript

currently in preparation and forthcoming).[10]  During the call, Magistrate Judge

Fitzsimmons inquired as to "what the urgency of obtaining the information might be,"

and plaintiffs' counsel responded that, "if a ruling is expected in the near future" as to

the Motion for Summary Judgment, "then we can wait on that."  Id. at 2:06 p.m..

Essentially, then, plaintiffs indicated that there was no urgency to their requests.

Furthermore, Magistrate Judge Fitzsimmons clearly articulated a holding with respect to

the Motions to Compel that envisioned waiting for the court to decide the pending

Motion for Summary Judgment:

> Specifically what's going to happen is that Ms. Szukala is going to
> inquire of clients whether they have documents that explain the
> calculation of the risk scores for the individual plaintiffs. . .With
> respect to most of the more general categories or requests, I'm
> going to hold off on those until I find out, one, what the
> defendants produce in response to this order and, secondly,
> what's up with Judge Hall.

Id. at 2:22 p.m..  Plaintiffs did not challenge this decision to wait until after the resolution

of the Motion for Summary Judgment to address the discovery matters; indeed, they

suggested it.  At no time during the entire call did plaintiffs state that they had filed a

Rule 56(f) Declaration, nor did they argue that any outstanding discovery was essential

---

[10]  Although Magistrate Judge Fitzsimmons states that the purpose of the conference call is to "discuss the pending Motion to Compel, Number 199," it appears to this court that plaintiffs' statements on the conference call were made in consideration of both the August 27, 2009 Motion to Compel (Doc. No. 175) and the October 20, 2009 Motion to Compel (Doc No. 199).  See, e.g., Recording at 2:06 p.m. ("The documents we've requested in this Motion to Compel as well as a previous Motion to Compel are going to be used by our experts to conduct [disparate impact] analysis.  So if a ruling [on the Motion for Summary Judgment] is expected in the immediate future then we can agree to wait on that but if we're unsure, then my client would like to push forward and have resolution of their claim.").  Furthermore, Magistrate Judge Fitzsimmons made clear her intention not to entertain discovery issues with respect to statistical data until after inquiring into the status of the Motions for Summary Judgment and Class Certification, or, potentially, until after those Motions were decided.  Finally, at oral argument, plaintiffs' counsel admitted that she regarded the December 1, 2009 conference as pertaining to all discovery matters, not just the October 20, 2009 Motion to Compel.

to resolving defendants' pending Motion for Summary Judgment.  That the plaintiffs were silent as to these issues during the December 1, 2009 call indicates to this court that the further discovery plaintiffs seek is not actually essential to the resolution of the Motion that is now before the court.  At the very least, the plaintiffs' failure to pursue timely discovery during the December 1, 2009 call indicates *precisely* "what efforts the affiant has made to obtain those facts. . . and why those efforts were unsuccessful." Burlington Coat Factory, 769 F.2d at 929.  In light of the fact that the record of the December 1, 2009 call plainly reveals both that (1) plaintiffs represented to Magistrate Judge Fitzsimmons that the court could decide the Motion for Summary Judgment in advance of addressing discovery issues, and that (2) plaintiffs failed to make an effort to obtain the facts targeted in their Rule 56(f) Declaration on that call, the court now determines that the Rule 56(f) Declaration is insufficient.

Rule 56(f) was not designed to allow a plaintiff to engage in a prolonged "fishing expedition in the hope that he could come up with some tenable cause of action." Waldron v. Cities Service Co., 361 F.2d 671, 673 (2d Cir. 1966).  The evidence cannot be said to be unavailable because the plaintiffs have not diligently pursued discovery throughout the discovery period.  The alleged lack of discovery and the Rule 56(f) Declaration does not excuse plaintiffs' failure to offer factual evidence to support their disparate impact FHA claim.

ii.     Other Data Offered

As plaintiffs attempt to blame defendants for their lack of statistical support, at the same time they also attempt to offer evidence of a disproportionate effect in the form of generic data not relevant to their FHA claims.  First, plaintiffs claim that, "[f]or at

-29-

least the past three years, 94% of Defendants' servicing portfolio consisted of non-prime mortgage loans."  Opposition at 6.  While this statistic demonstrates the prevalence of EMC's non-prime loan sector, it does not enable undertaking the necessary comparison between minority and non-minority borrowers.  Second, plaintiffs point to general studies that "show that a higher proportion of minorities are present in the non-prime residential lending market than are present in the population as a whole." Id. (citing numerous reports).  This blanket claim fails to demonstrate a genuine issue of material fact as to whether EMC's policies have a disparate impact on minorities. Plaintiffs make no effort to link the studies to the Class period.  Furthermore, general evidence as to the identity of the entire population of non-prime borrowers (without proof that *every* non-prime borrower is a minority) is entirely insufficient to support the premise that minorities were overrepresented among *EMC's* non-prime borrowers and therefore disproportionately impacted by EMC's allegedly predatory policies with respect to non-prime loans.  Quite simply, plaintiffs needed to set forth evidence specific to the circumstances of this case to establish a material issue of fact, and they failed to do so.

### iii.    Consequence of Lack of Statistical Analysis

Where plaintiffs have failed to support their disparate impact claims with statistical evidence, courts have consistently denied those claims.  In Tsombanidis, the Second Circuit reversed the district court's decision that a town fire code had a disparate impact on particular residents because "plaintiffs did not present any statistical information nor did they show the fire code actually or predictably created a shortage of housing for recovering alcoholics in the community."  Tsombanidis, 352

F.3d at 575; see also Hack v. President and Fellows of Yale College, 237 F.3d 81, 91 (2d Cir. 2000) (upholding dismissal of FHA disparate impact claim because "students do not allege that Yale's policy has resulted in or predictably will result in under-representation of Orthodox Jews in Yale housing"); Graoch Associates # 33, L.P. v. Louisville/Jefferson County, 508 F.3d 366, 378 (stating that, with respect to the requirement of proving a discriminatory effect under the FHA, "a plaintiff must present statistical evidence. . . to state a prima facie case").

Where cases involve allegations of predatory lending, courts have been especially insistent on the existence of statistical evidence to maintain a disparate impact claim.  In Hargraves v. Capital City Mortgage Corp., 140 F. Supp. 2d 7, 21 (D.D.C. 2000), the court upheld an FHA claim largely on the basis that plaintiffs "provide[d] statistical evidence that, in the District of Columbia, [defendant] made a greater percentage of its loans in majority black census tracts than other subprime lenders, and made an even more disproportionately large number of loans in neighborhoods that are over 90 percent black."  In this case, however, plaintiffs have not come forward in their Summary Judgment Opposition with evidence -- statistical or otherwise -- concerning the proportion of loans made to minority customers.  This case thus more closely resembles Steed v. Everhome Mortgage Co., No. 08-13476, 2009 WL 139507 (11th Cir. Jan. 21, 2009).  There, the Eleventh Circuit determined that the district court properly granted summary judgment against an FHA disparate impact claimant where the plaintiff provided "*no* evidence of where [defendant] advertised or that [defendant] made an unusual number of loans in majority black areas."  Id. at *3.  The court proceeded to note that evidence of "general lending practices. . . provided no

-31-

information as to whether [defendant's]. . . actions had a racially disparate impact." Id. at n.2.  The named and Class plaintiffs' failure to support their cause of action with statistical evidence is a significant deficiency.

        b.    Other Evidence

      Although even the plaintiffs admit that disparate impact claims rely heavily on statistical data, courts have at least stated in dicta that other evidence may be used to establish a genuine issue of material fact as to whether there is a disproportionate impact on a protected group.  See Tsombanidis, 352 F.3d at 577 (describing that a "more qualitative comparison might also have supported the disparate impact theory"). Under this "qualitative comparison" approach, a plaintiff may offer evidence suggesting that a particular protected group possesses a greater need for the services that the targeted policy abolishes or effects.  Id. (determining that, had the plaintiffs established that recovering alcoholics need affordable housing more than non-recovering alcoholics, plaintiffs could have maintained their claim without any statistical evidence that actually demonstrates recovering alcoholics were more severely impacted by the policy).  Still, even under this qualitative approach, the assertion of an FHA claim will "likely require some quantification" because although "there may be cases where statistics are not necessary, there must be some analytical mechanism to determine disproportionate impact". Id. at 576, 577. In Tsombanidis, the Second Circuit determined that, "[i]f a significant correlation exists between being disabled and living in group houses, a disparate impact on group housing could conceivably establish a prima facie disparate impact claim." Id. (citations omitted).  Likewise, in this case, if a significant correlation exists between being a minority and having a non-prime loan, it is

conceivable that EMC's policies having a disparate impact on non-prime borrowers could establish a prima facie FHA claim. Nonetheless, plaintiffs proffer no evidence to create a genuine issue of material fact as to whether such a correlation exists.

It appears to the court that the only evidence plaintiffs do offer to support their claim is the specific ways in which the named plaintiffs' loans were (predatorily) serviced by EMC. Indeed, plaintiffs argue extensively that there exist genuine issues of material fact regarding whether EMC erred in servicing the named plaintiffs' loans. <u>See</u> Opposition at 10-20. Even assuming that EMC did erroneously serve the named plaintiffs' loans, this remains insufficient to establish a genuine issue of material fact as to whether there exists a disproportionate impact on minorities for purposes of the FHA. While isolated incidents may give rise to a discriminatory treatment claim under the FHA, they do not support a disparate impact claim. Given that EMC is one of the nation's largest mortgage loan servicing companies, 2d Amd. Complt. at ¶ 12, selecting three loans held by minorities and evaluating the way in which EMC serviced those loans does not demonstrate that any EMC policy "actually or predictably results in. . . discrimination." <u>Tsombanidis</u>, 352 F.3d at 575. Because plaintiffs have failed to offer any evidence to support the allegation that EMC's policies disproportionately impact minorities, plaintiffs have failed to "present such evidence as would allow a jury to find in his favor," and summary judgment for the defendants is appropriate as to the FHA disparate impact claim. <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000).

C.    <u>Legitimate Business Interest</u>

Defendants argue in the alternative that, even if the plaintiffs have established a prima facie disparate impact claim (through identifying a facially neutral policy and

showing that the policy has a disproportionate impact), EMC's servicing practices are nonetheless justified under the framework of the FHA.  Id. at 14-16.  In FHA cases, once a plaintiff has established a prima facie case, the burden shifts to the defendant to establish "a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect."  Huntington Branch, NAACP, 844 F.2d at 936.  In cases against private individuals, courts have continued to apply this burden shifting framework and have inquired as to whether there exists a "business justification" instead of a "governmental interest."  See Hack, 237 F.3d 81, 99 (drawing upon Title VII case law and determining that, under the FHA, the defendant must assert that the targeted practice is "reasonably necessary to achieve an important business objective"); Salute, 136 F.3d at 302 (applying burden shifting framework to FHA claim against private defendant).

Defendants assert that EMC's mortgage servicing practices with respect to the named defendants are justified because EMC attempted to correct those errors, and EMC "not only has a legitimate business interest in correcting those errors, EMC followed its procedures to ensure that those errors were corrected."  Mot. for Summ. Judg. at 15.  Plaintiffs respond by acknowledging that EMC surely has a legitimate business interest in correcting the errors it makes, but noting that EMC offers no justification for making the errors against non-prime loans in the first place.  Opposition at 21.

Plaintiffs are correct that "[d]efendants fail to articulate a single legitimate business practice that mandates treatment for non-prime mortgages which leads to a disparate impact on the holders of those mortgages."  Id.  It strikes the court that it

-34-

would be entirely reasonable for EMC to claim that such a legitimate business practice exists; it seems intuitive that differentiating between the ways in which EMC collects, regulates, and otherwise services non-prime and prime loans would be a practice that is "reasonably necessary to achieve an important business objective," namely the timely receipt of payments from its borrowers.  Nonetheless, defendants do not assert such a business interest.  As plaintiffs correctly observe, EMC offers no business justification for the policy that plaintiffs assert EMC has in place to treat non-prime loans differently from prime loans.  Therefore, at the very least, plaintiffs have established that a genuine issue of material fact exists as to whether there is a legitimate interest for the targeted policy of this suit.

## V.    CONCLUSION AND REMAINING MOTIONS

For the reasons stated above, the court finds that the plaintiffs have failed to establish that there exists a genuine issue of material fact with respect to the existence of a sufficiently specific, facially neutral policy of EMC that is the subject of this FHA claim.  Additionally, the plaintiffs have failed to raise a genuine issue of material fact as to whether this policy has a disproportionate impact on a protected class because plaintiffs have failed to put forth any evidence that enables the analytical comparison that is required under the FHA: how EMC's policies effect minorities who have their loans serviced by EMC compared with how those policies effect similarly situated non-minorities.  Therefore, plaintiffs have not "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and the defendants are entitled to summary judgment.  The defendants' Motion for Summary Judgment (Doc. No. 153) is **GRANTED**.  The Clerk is ordered to close the case.

Given the court's resolution of the Motion for Summary Judgment, the remaining motions need not be addressed.  Accordingly, plaintiffs' Motions to Compel (Doc. Nos. 175, 199) and Motion to Certify Class (Doc. No. 189) are hereby terminated as moot. Further, defendants' Motion to Deem Admitted Certain Statements in its Local Rule 56(a)(1) Statement and Motion to Strike Statement of Material Facts (Doc. No. 187) is also terminated.

**SO ORDERED**.

Dated at Bridgeport, Connecticut this 22nd day of December, 2009.


    /s/ Janet C. Hall
Janet C. Hall
United States District Judge